# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY 11201
Tel: (718) 330-1200  Fax: (718) 855-0760

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

Eastern District of New York
Michelle A. Gelernt
*Interim Attorney-in-Charge*

April 19, 2024

BY ECF and Email
The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Dewayne Tripp*, 22-CR-336 (MKB)

Your Honor:

## PRELIMINARY STATEMENT

Dewayne Tripp is a single father whose untreated substance abuse, trauma of his youth, and ongoing economic challenges led him to the instant case. He also made many mistakes while this case was pending. However, as a single father, he is raising his son full-time, and cares deeply for his children and hopes for a better future for them. He regrets his conduct during the underlying incident and while on pretrial supervision. Dewayne wishes to move forward and lead a more productive life for himself, his family and his community. We are therefore requesting a sentence of time served.

### Dewayne's young adulthood was beset by trauma.

Dewayne was born and raised in Brooklyn with his two sisters, Vanessa Tripp and Veronica Tripp. He and his sisters were raised by a single mother, Cecilia Young, who supported her children despite the absence of her children's father, Dewayne Tripp. Mr. Tripp was rarely present in his children's lives. Dewayne and his family lived in public housing for most of his life. His mother did her best to provide her children while working as a caretaker for NYCHA. She did everything she could to ensure that they had a safe, happy and healthy upbringing.

As a child, Dewayne loved to watch and draw cartoons, and play video games and basketball. Dewayne attended Brooklyn schools for most of his education. For elementary school, he attended P.S. 307, near his home in Brooklyn, and later attended I.S. 117 (formerly "J.H.S. 117") near the border of Clinton Hill and Bedford-Stuyvesant in Brooklyn. In middle school, math and science were his favorite subjects

1

and he loved playing video games and basketball. Although he struggled with asthma in his youth, at I.S. 117, he played on the school's junior varsity team. He worked hard and showed promise as a basketball player. Although he started on the bench in sixth grade, he eventually became a starter on the team in seventh grade.

However, his entire life would change at one of the most critical stages of his development as a young man. As he was matriculating to high school from I.S. 117, he began to get involved with the "wrong crowd" and found himself getting into more and more trouble. Eventually, he had his first contact with the criminal justice system at the age of 14. As a result of that contact, he found himself incarcerated for an entire year at a juvenile detention facility in Middletown, New York. It was in Middletown that he would begin high school, away from his friends, his family, and his community. His early incarceration would have ripple effects for the rest of his life.

After his release from the juvenile detention facility, he moved back home with his mother and tried to pick up the pieces of his life. But everything was different. He enrolled in George Westinghouse Career and Technical Education High School in downtown Brooklyn for 10th and 11th grade. However, he struggled to keep up found himself unable to focus. Unfortunately, his prior education had not prepared him for the next level, particularly given the trauma that he experienced in juvenile detention. Notably, his middle school was burdened by the challenges of low academic performance for students. According to an "accountability report" prepared by the State University of New York for the 2005-2006 school year, I.S. 117 had failed to make sufficient progress in meeting certain educational metrics in English Language Arts and Math for all students for seven consecutive years.[1] In 2008, when Dewayne was 14 and incarcerated in Middletown, I.S. 117 was closed due to poor academic performance.[2] Unfortunately, given the numerous challenges that he faced, he eventually left school after the 11th grade.

<u>Dewayne is devoted to his children.</u>

Dewayne is especially proud of being a father and has been actively involved in his children's lives. He beams when speaking about his daughter Lauren (6), describing that "she's so polite, she's very sensitive." For his son Zaiden (5), he

---

[1] The University of the State of New York, The State Department of Education, "Accountability Status Report: English Language Arts, Mathematics, Science and Graduation Rate for JHS 117 Francis Scott Key in NYC GEOG DIST #13 – RIC #8," Apr. 22, 2006, https://www.p12.nysed.gov/repcrd2005/school-accountability/331300010117.pdf.
[2] Insideschools.org, "I.S. 117 Francis Scott Key School," https://insideschools.org/school/13K117 (last accessed Apr. 17, 2024).

recognized early on that "I saw the younger me in him," as a restless young boy who at times struggled with behavioral challenges in school. He became concerned when Zaiden was expelled from school while living with Zaiden's mother, and with what he felt were negative influences around Zaiden. Eventually, Zaiden came to live with Dewayne and Ms. Young, where Dewayne raised Zaiden full-time until his detention in this case.

As a full-time parent, Dewayne was immersed in every facet of Zaiden's life. Every day, he handled pick up and drop off at school for Zaiden and served as the emergency contact. Notably, Zaiden attends P.S. 307, the same elementary school Dewayne attended when he was a child. When Zaiden would act out in class, the teachers would call Dewayne and he was able to help Zaiden calm down and focus. Eventually, Zaiden's teachers would just threaten to call Dewayne, and the mere mention of his father would instantly improve Zaiden's behavior when he was unruly. Every night, Dewayne made sure that Zaiden did his homework, and did his best to teach him life lessons: "I was on top of my son for school and made sure his homework is always done, and I was always on my son about being respectful to women."

When speaking of his children, Dewayne notes that they "changed me for the better. I had two beautiful kids. I had to be a role model; I had to lead them the right way." He described spending lots of time with them, including taking them to Disneyworld and the Nickelodeon Museum in New Jersey. Dewayne also envisions a future where his children are free to pursue their dreams. "My son wants to be a cop and I encourage him. If that's his dream to pursue it, I want him to do it."

Dewayne's incarceration has been especially hard on Zaiden. He noted that Zaiden is currently in therapy because he cried in school about missing his father. Due to the frequent lockdowns at MDC, discussed more below, he has not been able to contact Zaiden as regularly as he would like. Despite these challenges, he has deep hopes for his Zaiden's future: "I want him to learn from me how to be independent, I want him to be punctual, I want him to be everything. I don't want him to get caught up in the system. I don't want this to become him."

<u>Alcoholism and the instant offense.</u>

For the last several years, Dewayne has struggled with an addiction to alcohol. He first started drinking in 2014 at age 19. However, he found that he began to drink excessively with the onset of the COVID-19 pandemic in 2020. Much like people around the world who struggled through the lockdown, Dewayne dealt with the trauma of extended isolation through substance abuse. He reports that "I was

running from my problems and looking for answers in the bottle, but when I got sober, all my problems came back." Over time, his addiction to alcohol began to consume his entire life. He drank daily and throughout the day – "I couldn't do anything without drinking – if I'm eating, I need to drink, I would wake up and drink." It is clear from his conduct during the underlying offense, where he was observed on surveillance video waving around what appeared to be a firearm and threatening a convenience store employee, that he was inebriated at that time. Dewayne confirmed his intoxication and further reported that he was drinking a bottle of tequila when he was arrested. Further, as noted in the PSR, Dewayne had also previously engaged in regular use of marijuana and a substance abuse condition was added to his bond. PSR ¶¶49-50. Dewayne has never been connected to substance abuse treatment and would be willing to engage in outpatient treatment in the future.

During the pendency of this case, Dewayne made a series of mistakes and poor decisions in failing to abide by the conditions of pretrial supervision, including absconding from supervision, along with other violations of which the Court is well aware. Further, his actions negatively affected his relationships with his mother, sisters, and significant other, and impacted his ability to raise his children. His poor decision-making may also be related to his incarceration at an age which was critical in his development, and may have impacted his own growth in his adulthood, while also having to navigate raising his son full-time.

Dewayne deeply regrets those mistakes. Today, he has repaired his relationship with his mother and sisters and speaks with them regularly. They have re-engaged in his case and remain supportive of him. Further, as noted above, he does his best to speak to his children as much as possible, but his communication with them has been stymied by the repeated lockdowns at MDC.

<u>Dewayne's detention at MDC has been especially harsh.</u>

For the last year, Dewayne has been detained at MDC and has endured extremely harsh conditions, which were exacerbated during the height of the COVID-19 pandemic and have lingered through the present. While at the MDC, he has experienced near constant lockdowns, where people are often locked in their cells all day, with minimal time outside of the cell, even to take a shower. His access to phones has been extremely limited and he has regularly been served cold meals. As Southern District of New York Judge Furman recently wrote, "confining [people] to their cells [at MDC] is . . . tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *United States v. Gustavo Chavez*, 22-cr-303 (S.D.N.Y. Jan. 4, 2024) (attached hereto as Exhibit A).

4

Most recently, Dewayne has observed maggots in the food that was served to him and other detainees in early April. His observation has been confirmed by several other people incarcerated at MDC, as well as in news reports.[3] The unsanitary food and lockdowns are compounded by other structural issues, including dirty vents, broken lights, and non-working toilets.

As this Court is aware, judges in this district and SDNY have granted leniency at sentencing for defendants incarcerated at MDC given the severe conditions. These courts have acknowledged that the unusual harshness of incarceration diminishes the retributive or deterrent need for a guidelines sentence, and they have imposed terms of imprisonment that are substantially less than the bottom of the defendants' advisory ranges, including many sentences for time served. *See United States v. Narcissi*, 20-cr-449 (RPK) (E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence where guidelines range was 24-30 months); *United States v. Shi*, 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where guidelines range was 12-18 months); *United States v. Piper*, 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where bottom of guidelines range was 63 months). *See also United States v. Flowers*, 14-cr-471 (DLI) (E.D.N.Y. Apr. 20, 2022) (imposing 24 months in violation of supervised release case where guidelines range was 33-41 months); *United States v. Camacho*, 19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months); *United States v. Aracena de Jesus*, 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines range was 30 months).

<u>Dewayne will bear the brunt of collateral consequences with a felony conviction.</u>

Dewayne's future opportunities for employment, housing, and a host of other issues will be further impacted by his conviction in the instant matter. A felony conviction triggers a host of collateral consequences, including significant barriers to employment, education, and access to credit and financial services:

> Collateral consequences affect many areas of life. Some criminal convictions can lead to loss of civil status; a citizen may lose the right to

---

[3] *See* John Annese, "Maggot-infested meals being served to inmates at Brooklyn federal jail, lawyers say," The New York Daily News, March 30, 2024, https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/ (attached as Exhibit B).

vote, serve on a jury, or hold office; a noncitizen may be deported or become ineligible to naturalize. A conviction may make a person ineligible for public benefits, such as the ability to live in public housing or hold a driver's license. . . . A criminal conviction can also make a person ineligible for a license or permit necessary to be employed or to do business, or cause forfeiture of a pension. Criminal convictions can also affect family relations, such as the ability to have custody or visitation of one's child.[4]

In New York, a felony conviction can subject someone to 374[5] separate barriers to employment, including absolute bars on becoming a Certified Nursing Assistant,[6] a firefighter,[7] a security guard,[8] or even working as the director of a funeral home.[9] Future employment opportunities may be greatly impacted by the instant felony conviction. As noted in the PSR, Dewayne faces several additional collateral consequences, such as restrictions on public benefits, housing, license suspensions, and jury service, among a host of other consequences. PSR ¶74.

<u>The goals of sentencing will be best served with a time served sentence.</u>

Pursuant to 18 U.S.C. § 3553(a)(6), in determining a sentence that is sufficient, but not greater than necessary, the Court "shall consider" "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This Court has full authority to consider any evidence it wishes in deciding whether or not the guidelines "properly reflect § 3553 considerations[.]" *Rita v. United States*, 551 U.S. 338, 351 (2007); *see also Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). In particular, the district court may consider whether the guidelines applicable to a case "properly reflect § 3553 considerations," may reach the "merits of such a claim," may act on such concerns, and determine, as a general matter, that "the Guidelines reflect an unsound judgment." *Rita*, 551 U.S. at 351-357; *see also Kimbrough*, 552 U.S. at 85.

---

[4] Gabriel Jackson Chin, "Collateral Consequences," Academy for Justice, A Report on Scholarship and Criminal Justice Reform (Erik Luna et al., 2017), https://ssrn.com/abstract=2948025 (emphasis added).

[5] *See* National Inventory of Collateral Consequences of Conviction, Collateral Consequences Inventory, https://niccc.nationalreentryresourcecenter.org/consequences.

[6] *See* 10 CRR-NY § 402.7 ("Where the criminal history information of a prospective employee reveals a felony conviction at any time for a . . . class B or C felony, any class D or E felony defined in articles . . . 155 [Larceny offenses], . . . of the Penal Law or . . . any comparable offense in any other jurisdiction, the Department shall propose disapproval of such person's eligibility for employment. . . .") (emphasis added and omitted).

[7] *See* N.Y.C. Admin. Code § 15-103(b).

[8] *See* N.Y. Gen. Bus. L. §§ 74(2), 89-h(4).

[9] *See* N.Y. Pub. Health L. § 3450(1)(b).

6

Here, the § 3553(a) factors support a time served sentence. Dewayne's history and characteristics make it clear that his struggle with substance abuse precipitated the underlying conduct in this case and impacted his poor decision-making while on pretrial supervision. Additionally, he is a devoted single father, who is raising his son full-time and hopes to help Zaiden avoid the pitfalls of his own youth. Dewayne has worked to repair the relationships with his family and has earned back their trust and support. Dewayne has tremendous potential for the future. Further, supervised release will be able to provide Dewayne with "needed educational or vocational training, medical care, or other correctional treatment" including substance abuse treatment. Dewayne hopes to start a new chapter in his life after the conclusion of this case: "I want to have a full-time job, I want to go back to school to get my GED, and I want to spend more time with my kids."

## CONCLUSION

For the aforementioned reasons, we respectfully request that the court impose a sentence of time served, as such sentence will be sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

/s Karume James
Karume James
Attorney for Dewayne Tripp
Assistant Federal Defender
Federal Defenders of New York
(347) 638-3098
karume_james@fd.org

cc:   AUSA Miranda Gonzalez (by ECF and email)
      Chambers of the Hon. Margo K. Brodie (by email)